Drake, Ch. J.,
delivered the opinion of the court:
The treaty entered into ou the 2d day of February, 1848, at Guadalupe Hidalgo, between the United States and the republic of Mexico, the ratifications of which were exchanged on the 30th of May, 1848, authorized the organization by the United States of a board of commissioners, to hear and determine *429 claims by citizens of the United States against Mexico. Among the claims presented before the board organized under that treaty was one in favor of Alexander J. Atocha, a naturalized citizen of the United States, who had resided for several years in the city of Mexico, and was expelled from the republic of Mexico, in March, 1845, by the revolutionary government which overthrew President Santa Anna. The claim was, on the 15th of March, 1851, disallowed by that board. Atocha appealed to Congress, and, after years of effort, succeeded in obtaining the passage, on the 14th of February, 18(35, of an act for his relief, (13 Stat. L., 595,) in the following terms:
“ That the Court of Claims be, and the said court is hereby, directed to examine into the claims of Alexander J. Atocha against the government of Mexico for losses sustained by him by reason of his expulsion from that republic in eighteen hundred and forty-five; and if they shall be of opinion that the said claim was a just one against Mexico when the treaty of eighteen hundred and forty-eight was ratified, and was embraced by said treaty, they shall then fix and determine the amount of the same; and that the loss of damage so sustained being adjudicated and determined by said court,, the same shall be paid to the said Alexander J. Atocha out of any money in the Treasury not otherwise appropriated : Provided, hoicener, That the amount so to be paid shall in no event exceed the balance of the three and a quarter millions of dollars provided by the ñftecmth article of the treaty of Guadalupe Hidalgo for the payment of claims of citizens of the United States against the government of Mexico, which still remains unapplied to that object.”
Under this act this suit was instituted.
Being a private act, and unusual in its requirements, our first duty in administering it is to ascertain the scope of the authority conferred by it. In doing so the rule laid down by the Supremo Court in De Groot's Case, (5 Wallace, 419,) that the jurisdiction of this court “ is limited precisely to such cases, both in regard to parties and to the cause of action, as Congress has prescribed,” would seem to be peculiarly applicable ; since the act, unlike any other special act of similar kind which has come before us, does not leave us to the full exercise of our general powers, but specifically prescribes the action to be taken, and declares, in terms, that the loss or damage which *430 may be adjudicated by tbis court iu favor of Atocha, not exceeding a designated balance in the Treasury, “ shall be paid to the said Alexander J. Atocha out of any money in the Treasury not otherwise appropriated.” It would seem, therefore, that it was the intention of the legislature that this case, except as to mere modes of procedure, should derive no aid from the general powers and jurisdiction of the court. Indeed, it would appear to have been intended that this court should occupy toward the case the same position as that held by the board of commissioners; and this view is strengthened by the subsequent passage of the amendatory Act April 5, 1870, (16 Stat. L., 633,) authorizing the use here, by either party, “of such portions of the evidence taken in pursuance of the rules and regulations of the commission, * * * and laid before said commission, as consist of the evidence of persons since deceased.”
In the light of these views, we repeat the construction previously given by this court to the act, (6 C. Cls. R., 69,) when we held that it included only the following particulars: 1. An examination into the claim of Atocha against the government of Mexico for losses sustained by him by reason of his expulsion, in 1845, from that republic; 2. A decision of the question whether his claim was a just one against Mexico when the treaty of 1848 was ratified; 3. A decision of the question whether, if found j ust, it was a claim embraced by that treaty ; and, 4. If these points be decided in his favor, then a fixation and determination of the amount of the claim. Controlled by these conclusions as to the scope of our powers, we have examined the case, and will now express our judgment of it.
The fact of Atocha’s expulsion from the republic of Mexico in March, 1845, by order of the revolutionary power which overthrew President Santa Anna, is not disputed. This expulsion was either justifiable or unjustifiable, and according as it was the one or the other is Atocha’s claim just or unjust.
When Atocha took up his abode in Mexico he became subject to the laws of that country; among which was the following, to be found in the “ Recopilación de Arrillaga
“ The supreme government shall have power to issue a pass- , port to, and cause to leave the republic, any foreigner, not naturalized, whose longer residence it may deem pernicious to the public order, even though such foreigner may have entered *431 and established himself in the republic conformably to the regulations prescribed by law.”
The right of Mexico to enact such a law, and to enforce it against foreigners who made themselves parties to her internal dissensions, need not be discussed. Nor need we consider in this connection what the rights of Atocha would have been if he had, by making himself such a party, given “ the supreme government” reason to “deem his longer residence” there “ pernicious to tiie public order.” If, however, he did not make himself such a party, he has a just claim for indemnity; for no government of that country, revolutionary or constitutional, had any right, wantonly'and causelessly, to expelan American citizen from its borders.
The allegation made at the time by the Mexican secretary of foreign relations in a letter to the American minister, as a justification of Atocha’s expulsion, ivas that Atocha had taken part in political dissensions, joining a portion of the army which ivas no longer obedient to the orders of the government, and that he was notoriously one of the principal agents who acted against that government.
The board before which this claim was presented based their disallowance of it upon that letter, taken in connection with the fact that, though the writer boldly charged the American minister with knowing the fact that Atocha was one of those principal agents, yet that minister had failed to make any reply, or to deny that the facts alleged were within his knowledge.
However the board may have been justified by the case before them in giving such force and effect to that letter, and the failure of the American minister to reply to it, we are not required by the case presented here to do likewise. The case made in 1873 is essentially different from that made in 1851, and we have therefore had no difficulty in holding it fairly established that Atocha did not take part in the political dissensions which existed in Mexico during his residence there.
'That he was a known personal friend of President Santa Anna cannot be doubted. That he was a financial agent of Santa Anna’s administration was well known. That he was a visitor at Santa Anna’s residence, at a distance from the city of Mexico, when the revolution broke out in that city, which deposed Santa Anna, is likewise indisputable. That, on his return to that city, these three facts should have been seized upon by the *432 revolutionists — not yet, perhaps, so impregnably intrenched in power as to renounce persecution of opponents — as sufficient proof that he had taken part in the political dissensions stirred up by their own revolutionary movement, was not very strange. That as soon as that conclusion was reached, the process of exaggeration — to use a mild term — commonto all revolutionists should have amplified him in their minds to the dimensions of one of “ the jirincipal agents who acted against ” their so-called government, was natural. That the leaders of the revolution should soon convince themselves that what they had come to believe to be a fact was notorious in all the city, if not all the republic of Mexico, would not seem singular to any one who might read the evidence given in this case by Mexican witnesses, and observe the apparently constitutional tendency of the Mexican mind to pronounce a thing notorious, where men of a different temperament would not see the notoriety, and to assert that to be a fact which, on closer scrutiny, is found to be only a deduction. And, finally, that the Mexican secretary should have flatly alleged that the American minister knew the secretary’s charge against Atocha to be true, though not so much to have been expected, was still characteristic of revolutionists, with whom always audacity is a necessity if not a virtue.
It is not, however, the province of this court to view Atocha’s conduct through the Mexican secretary’s letter alone nor through the fact that that letter was not answered, but to observe and characterize it in the light of all the evidence now adduced, of which there is much more than went before the board organized in 1849.
As to the failure of Mr. Shannon, the American minister, to answer the Mexican secretary’s letter, we have now whatwms. not before that board — the explanation of his silence, given by the former, which may properly be presented in this connection, as follows:
“ My object in sending a note to the Mexican secretary, in relation to the order issued against Mr. Atocha, was to notify the Mexican government that Mr. Atocha considered the order of expulsion illegal and unjust, and in violation of existing treaties between the two governments, and that he would hold the government of Mexico responsible for the damage he might sustain. After sending this note to the Mexican seeretai’y, and *433 after a full consideration of the whole subject, I advised Mr. Atocha to comply with the order of expulsion, believing, as I then did, that by violating that order he would endanger his own person, if not his life. I was satisfied that strong prejudices existed against him, as well as all other Americans, on the part, at least, of some of those in power. The annexation of Texas to the Dnited States, which was then daily expected to be consummated, had engendered an unfriendly feeling generally among the Mexicans at the capital against all who claimed to be citizens of the Dnited States. I did not think, in the then temper of the public authorities of Mexico, that the time was propitious for discussing or settling Mr. Atocha’s grievances, nor did I think it at all probable that a revocation of the order of expulsion could be procured. It was under these circumstances that I advised Mr. Atocha to comply with the order j and my note on the subject was sent in as a protest, and not with the view to elicit a discussion of the merits of the caseatthattime. I was expecting daily to hear of the annexation of Texas, and felt confident that in such event diplomatic intercourse would be suspended, and that war would in all probability follow. I deemed it prudent, then, to advise Mr. Atocha to comply with the order, and to remove himself and family from the country, and wait a more propitious time for the discussion and adjustment of bis grievances. * * * I did not answer the reply, for the reason that I only intended my note as a protest, and did not intend at that time to go into the discussion of the case. I did not acquiesce in the reply or any other matter therein stated, and did not for a moment suppose that my note replying at that time would or could be construed into an acquiescence in the statement contained in the reply to my note.”
It can hardly be doubted that if this explanation had been before the board they would not have given the weight they did to Mr. Shannon’s failure to answer the Mexican secretary’s letter. That letter, then, must stand alone, unaided by the minister’s silence $ and it is almost the only evidence inculpating Atocha. Standing alone, it could not be regarded as proof of Atocha’s complicity in the political dissensions of Mexico.
But in 1871, after Atocha’s death, and more than twenty-six years after his expulsion, the testimony of witnesses was taken in Mexico to establish that complicity. We have carefully ex *434 amined that testimony, and weighed it in the scales with the large mass of opposing evidence — including that of Santa Anna himself — and our deliberate conclusion is, that Atocha did not take part in the political dissensions of that country. The finding of this fundamental fact takes from Mexico the benefit of her own law of expulsion, above cited, for it shows that a law which was intended for the protection of the country from the disturbing interferences and machinations of meddlesome foreigners was used as a means of causeless oppression and wrong toward one who had not offended, who could not resist, who could only protest and appeal to his country, to time, and to judicial scrutiny for the vindication and establishment of the truth and his right.
The justification urged by the Mexican secretary being un-sustained, the question arises whether, as a matter of right, without accountability to any one,Mexico might expel a citizen of the United States from her borders, whenever, in the language of the order in Atocha’s case, “the supreme government has thought proper to determine” his'expulsion. This brings into view treaty stipulations between the United States and Mexico, in force at the date of Atocha’s expulsion. The fourteenth afticle of the traty of 1831 is that by which this question should be determined. It is as follows:
“Artigue XIY. Both the contracting parties promise and engage to give their special protection to the persons and property of the citizens of each other, of all occupations, who may be in their territories, subject to the jurisdiction of the one or of the other, transient or dwelling therein ; leaving open and free to them the tribunals of justice for their judicial recourse, on the same terms which are usual and customary with the natives or citizens of the country in which they may be; for which they may employ, in defense of their rights, such advocates, solicitors, notaries, agents, and factors as they may judge proper, in all their trials at law; and the citizens of either party, or their agents, shall enjoy in every respect the same rights and privileges, either in prosecuting or defending their rights of person or of property, as the citizens of the country where the cause may be tried.”
It requires no labored exposition of this article to show that the expulsion of Atocha, when he had committed no offense against the existing government of Mexico, was a direct breach- *435 of the promise and engagement of Mexico therein set forth. He had a right, as an American citizen, to Mexico’s “special protection to Txis person and property;” instead of which he received peremptory and causeless expulsion, requiring the sudden conversion of his personal effects into money at a sacrifice, depriving him of the opportunity, by his personal presence, of availing himself of favorable occasions for converting his Mexican securities into money on advantageous terms, and breaking up totally his business arrangements and prospects.
But even if he had been guilty of political offenses against the existing government, he was still protected by the article in question of the treaty of 1831, for it is found as a fact in the case that, under the constitution and laws of Mexico in force in 1845, there was no power in the Mexican government to. expel a citizen of Mexico from that country without, even if it could be done with, a trial and condemnation. G^his article provides for the “ leaving open and free,” by each country to the citizens of the other, “its tribunals of justice on the same terms which are usual and customary with the natives or citizens of the country in which they may be;” and that “the citizens of either country should enjoy, in every respect, the same rights and privileges, either in prosecuting or defending their rights of person or of property, as the citizens of the country where the cause may be tried.”
Now, while we may not doubt that, in a time of intestine war in any country, the successful party may, as an incident of the warlike situation, expel from the country by military force a foreigner who, in violation of his obligation of neutrality, took part in the war, and found himself on the losing side, yet this right of forcible expulsion, by the power of the sword, does not survive the period of actual war.- Exercised while war is flagrant, it is the merciful alternative of death or imprisonment and is altogether justifiable as a measure of self-protection. But when the war is over, the judicial tribunals are re-opened, judicial process is again available in lieu of the sword, municipal law replaces martial law, and a fair trial by a lawfully-established court is the right of every citizen. By the treaty of 1831 that right was guaranteed to American citizens residing in Mexico, as fully as the constitution and laws of Mexico guaranteed it to her citizens; and, as we have seen, no citizen *436 of Mexico could be lawfully expelled from Ms country without a trial. If so, then no more could Atocha.
His expulsion thus appearing to have been not only causeless, but in violation of treaty stipulations, and, therefore, on both grounds wrongful, it follows that, at the time thereof, he had a just claim against Mexico for the loss and damage sustained by him through the wrongful act of her government.
This decided, the next point of inquiry indicated by the act is, whether the claim was a just one when the treaty of 1848 was ratified. To this there can be but one answer, and that is, that there is nothing disclosed which would make the claim less just in 1848 than it was in 1845. In the interval no reparation was made or offered by Mexico, and Atocha committed no act which could in law discharge Mexico from his just claim. Hence, on the 30th of May, 1848, when the treaty was ratified, the claim was still a just .one against Mexico.
The next point of inquiry indicated by the act is, whether the claim was embraced by the treaty of 1848. This is determined by Articles XIY and XV of the treaty, in the following words:
“Article XIV. The United States do furthermore discharge the Mexican Republic from all claims of citizens of the United States, not heretofore decided against the Mexican government, which may have arisen previously to the date of the signature of this treaty; which discharge shall be final and perpetual, whether the said claims be rejected or be allowed by the board of commissioners provided for in the following article, and whatever shall be the total amount of those allowed.
“Article XV. The United States, exonerating Mexico from all demands on account of the claims of their citizens mentioned in the preceding article, and considering them entirely and forever canceled, whatever their amount may be, undertake to make satisfaction for the same, to an amount not exceeding three and one-quarter millions of dollars. To ascertain the validity and amount of those claims, a board of commissioners shall be established by the Government of the United States, whose awards shall be final and conclusive; provided that, in deciding upon the validity of each claim, the board shall be guided and governed by the principles and rules of decision prescribed by the first and fifth articles of the unratified convention, concluded at the city of Mexico on the twentieth day of November, one thousand eight hundred and forty-three; and *437 la no ease shall an award be made in favor of any claim not embraced by these principles and rules.” * * * *
The subject-matter of these articles was “ claims of citizens of the United States,” without specification, qualification, or restriction as to kind. Every description of claim was, therefore, intended to be embraced. The only conditions were : 1. That the claim should have arisen before the date of the signature of the treaty of 1848 ^ and, 2. That it should not theretofore have been decided against the Mexican government. Both these conditions are met in the present claim. It arose in 1845, and had not, on the 20th of May, 1848, been decided against the Mexican government. It is, therefore, embraced by the treaty of 1848.
The ruling of the preceding points in favor of Atocha leaves only the fixation and determination of the amount of loss and damage sustained by him by reason of his expulsion. In the nature of the case it is not always practicable to indicate the elements of a verdict of damages in a case ef personal wrong, nor, in our opinion, does the act require us to do so in this case. Our duty is simply to “fix and determine the amount of the claim,” and this must be done upon certain declared principles. In the fifteenth article of the treaty of 1848, it is " provided that, in deciding upon the validity of each claim, the board shall be guided and governed by the principles and rules of decision prescribed by the first and fifth articles of the unratified convention, concluded at the city of Mexico on the 20th day of November, 1843; and in no case shall an award be made in favor of any claim not embraced by these principles and rules.” In the first of those articles those principles and rules were indicated in the terms of the oath to be taken by the members of a commission proposed to be organized thereunder, •which required them to examine and decide impartially the claims submitted to them, * * * according to the proofs which should be presented, the principles of right and justice, the law of nations, and the treaties between the two republics.”
We hold that these principles and rules, adopted by the two nations by treaty, are applicable to the decision of all claims embraced by the treaty of 1848, whether the decision was rendered by the board organized under that treaty, or be now rendered here. Guided by those principles and rales, we have fixed *438 and determined the amount of Atocha’s claim, at the time of his expulsion, at the sum of $86,201.21; but we do not hold this to be the limit of what should be allowed him now.
The board considered it “ according to the principles of right and justice, the law of nations, and the treaties between the two republics,” to allow interest upon every award in favor of a claimant, at the rate of 5 per centum per annum, from the origin of the claim to the close of the board’s existence, and the fact that such interest was embraced in every such award was distinctly mentioned by the commissioners in their final report; and the awards so made by them were paid by the United States. In this respect we follow the accepted precedent set by that board and by the United States, and allow interest at the same rate upon the amount of damage herein awarded, which, for twenty-eight years, two mouths, and twenty-one days from the day Atocha left the city of Mexico under expulsion, namely, March 5,1845, amounts to $121,651.39, making an aggregate of $207,852.60, which is fixed and determined as the amount of Atocha’s loss and damage by reason of said expulsion.
The final question is as to the form of the judgment to be entered in the case. Though the suit is nominally against the United States, it is in reality against the government of Mexico ; and the real question is, not whether a recovery shall be had against the Úhited States, but whether Atocha’s claim against Mexico is just, and, if so, what is its amount. The act under which we proceed nowhere authorizes this court to render a judgment against the United States, but simply requires it to fix and determine the amount of Atocha’s loss and damage-Whatever that may be, not exceeding a certain limit, the act declares, ‘‘shall be paid to the said Alexander J. Atocha, out of any money in the Treasury, not otherwise appropriated.” We therefore order the entry of a judgment in the following terms:
The court having, in pursuance of the “ act for the relief of Alexander J. Atocha,” approved February 14,1865, examined into the claim of said Atocha against the government of Mexico for losses sustained by him by reason of his expulsion from the republic of Mexico in the year 1845, are of the opinion that the said claim was a just one against Mexico when the treaty of 1848 between that country and the United States was ratified,- and was embraced by said treaty; and do fix and determine the amount of the loss and damage sustained by said *439 Atocha by reason of said expulsion at the sum of $207,852.60; which sum will be satisfied and discharged by the payment by the United States to Eliza A. J. Atocha, administratrix of the said Alexander J. Atocha, of $207,449.37, the balance of the three and a quarter millions of dollars provided by the fifteenth article of said treaty for the payment of claims of citizens of the United States against the government of Mexico, which now remains unapplied to that object.